S94A1095. WALKER v. THE STATE.

(449 SE2d 845)

HUNT, Chief Justice.

Jeffery Ray Walker was found guilty of the murder of Eugene T. Cooper and sentenced to life in prison. He appeals, and we affirm.[1]

1. Walker argues the evidence was insufficient to support a verdict of guilty. We disagree.

(a) The most significant evidence against Walker presented at trial was the recorded testimony of his co-defendant, Chris Hightower. In a series of interviews, Hightower told police: that he and Walker went to the victim's residence in Walker's car because Walker wanted to get some money; that Walker broke into the house; that he saw Walker sling the victim to the floor and shortly thereafter heard a shot; that he and Walker fled from the victim's yard after Walker came running from the house and jumped into the car; that on the Saturday morning following the murder Walker had $400 in cash and a quantity of drugs in his possession; and, that he had seen Walker with a .38 caliber revolver several days before the murder. Hightower's testimony concerning the cash and drugs in Walker's possession was corroborated by another witness. In addition, a police officer testified that Walker himself made several statements to police. On the night he was arrested at the scene of the murder, Walker said to

---

[1] The victim's body was found on the morning of August 24, 1991. On April 7, 1993, a jury found Walker guilty of felony murder, armed robbery, burglary, aggravated battery, three counts of aggravated assault and two counts of possession of a firearm during the commission of a felony. He was sentenced to life imprisonment. Walker's motion for new trial was filed on May 7, 1993, and denied on February 24, 1994. He filed notice of appeal on March 24, 1994. The appeal was docketed on April 15, 1994, and argued on June 21, 1994.

police, "I know something, I can help you out," adding that he had been with some women who had come into the room with money and blood-soaked towels talking about a man they had killed. A police officer also testified that on the afternoon on which Walker was served with the murder warrant, Walker told him that he had not killed Cooper but had stayed in a field on the other side of the house while someone else committed the murder. Walker also told police that he knew about the murder but that someone else had done it. Finally, two witnesses who had been Walker's cellmates during the time he was awaiting trial in the county detention center testified that Walker had told them that he had shot the victim. Reviewing this evidence in a light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Walker guilty of the crime for which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(b) At trial, Hightower recanted his earlier statements to police, saying that those statements were untrue and the product of police coercion. Walker argues that in light of that recantation, no rational trier of fact could find him guilty beyond a reasonable doubt. There is no merit to this argument.

The jury was authorized to decide whether to believe the inculpatory statements made by Hightower to police investigators, or to believe his exculpatory assertions at trial that he and Walker had nothing to do with the crime and that his previous statements were the result of police coercion. See *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982).

2. Walker argues that the trial court erred in allowing testimony of his bad character. During the trial a defense witness, in recounting the events of the night before the murder, told of an incident in which Walker had been involved and concluded her narrative by stating that "Jeff's not the type of person who would fight anyways." On cross-examination, the state elicited testimony from this witness that on a particular occasion in the past she had been concerned that Walker would get into a fight because when he was under the influence of "crank" he was "mean as hell."

A defendant is permitted to prove through his character witness a general reputation for a specific trait, but if he chooses to do so, the state is then allowed to show, by way of rebuttal, general bad character with respect to that particular trait. *Jones v. State*, 257 Ga. 753, 757 (363 SE2d 529) (1988). By testifying that Walker was not the kind of person who would fight, the defense witness became subject to impeachment as to the veracity of that statement, *Williams v. State*, 257 Ga. 761, 763 (363 SE2d 535) (1988), and the trial court did not err in allowing the state to ask about a specific incident in which Walker

had acted in such a way as to lead the witness to the conclusion that he would be prone to violence when using a particular drug. The testimony was relevant and its admission, even though it reflected adversely on the defendant, was proper.

We realize that relevant evidence may be excluded if its probative value is outweighed by its prejudicial impact. Here, though there was no proof that Walker had used methamphetamine on the night of the murder, there had been prior testimony that Walker had in fact purchased a quantity of methamphetamine that night. As the jury had already heard a witness testify that Walker was in possession of an illegal drug, the prejudicial impact of the statement, to the extent that that prejudice stemmed from statements identifying Walker as a drug user, was reduced. Thus, under these circumstances, the probative value of the evidence clearly outweighed its prejudicial effects.

3. Walker argues that the actions of the police in dealing with evidence denied him due process of law. Following the murder of Eugene Cooper and pursuant to their investigation, officers of the sheriff's department set up a roadblock on Saturday in front of the Cooper house in order to seek information about the murder from passing motorists. An officer testified that at about 8:00 p.m. that evening they learned from a witness, who denies she gave the police this information, that she had heard that Jeff Walker and Chris Hightower had committed the murder and that they were driving around in Walker's white Pontiac Grand Am. At this point, according to the police, a lookout was placed on Walker's car. At approximately 1:00 a.m. on the following Sunday morning the police stopped Walker's car and arrested him for theft of the vehicle. After police officers removed Walker and his companions, Chris Hightower and Billy Gooch, from the car, they found a bill of sale for the car showing that Walker had bought the car in July 1991, having put $600 down with the balance due on September 6, 1991. The police questioned all the occupants of the car about Cooper's murder, and, on the basis of information acquired during those interrogations, charged Walker with the murder.

A technician who had been called to the crime scene located and carefully photographed a set of automobile tire tracks in Cooper's yard; the technician used a ruler so that the tread type and width of the tires could be measured to scale. Investigators from the sheriff's office processed the interior and exterior of the car, but they found no evidence of blood. Fiber, hair and other tests done on the interior of the car likewise failed to connect any of the suspects with the murder. An officer testified that, contrary to ordinary practice, no photographs were taken of the car or the tires, nor were impressions made of the

tires.[2] At trial, none of the investigating officers could recall anything about the type, size or series of the tires; however, the officer who processed the car testified that he had measured the tire tracks found at the scene of the crime and that they were consistent with the wheel base of Walker's car, though he did not record the measurement of the wheel base in his report. The processing officer found wrappers, bags and other paper items from a fast-food restaurant in the car; these items he threw away, stating that he did not know whether a receipt from the restaurant had been among the items discarded. He made no inventory of the contents of the automobile, despite the fact that it was standard policy to do so.

On August 29, less than a week after the murder, the processing officer released the car to the used car dealership from which Walker had bought it at the request of Detective Evans, the lead investigator. At the time the car was released, it contained personal property which belonged to Walker. The officer who released the car testified that it was standard procedure to do so through the property and evidence officer, but that he had not followed standard procedure in this case; he stated further that he had not been required to secure a signed release form, and that he did not know who had picked up the car or when the pickup had been made. The police released the car despite the fact that they had discovered, as mentioned above, papers showing that Walker had purchased the car and despite the fact that the car would have constituted evidence in the car theft with which Walker was charged. Walker's down payment was never recovered. The car has never been located.

Early in September, the grand jury returned an indictment against Walker that included the auto theft charge. Walker was never asked about the theft of the car, and the theft charge was dismissed prior to trial. Detective Evans prepared his report of the crime on September 9, 1991; at that time he had a report indicating that Walker's car had been released to the automobile dealership. In December, Evans attended a pre-trial hearing at which defense counsel requested permission to view Walker's car. Evans testified that he heard the defense make its request, and also heard the assistant district attorney tell defense counsel that the car was either at the crime lab or in the impound lot, but did not say anything because he did

---

[2] At trial, the following exchange took place between counsel for defense and the lead investigator, Detective Evans.

Defense: Would it be a fair assumption on my part, Officer Evans, that if any tire on Jeff Walker's car even remotely resembled any of those tire impressions that [the state investigator] photographed that we would have a photograph or a tire impression up here in front of this jury? Is that a fair impression?

Det. Evans: I would say so.

not know where the car was; he said he learned about the release of the car early in 1992 after he looked into the matter. Defense counsel did not receive a copy of the report indicating that the car had been released in August 1991 until May 1992; Evans testified he did not know why it had taken so long to get that report to the defense.

Walker argues that his due process rights were violated because the release of his automobile and the destruction of materials in the automobile denied him access to exculpatory evidence. In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988). To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U. S. 479 (104 SC 2528, 81 LE2d 413) (1984). We apply these standards now to the evidence at issue.

First, regarding the contents of the Pontiac, Walker maintains that there may have been a receipt among the wrappers and other paper items from the fast-food restaurant which may have shown the time of the purchase or at least what the order number was. At trial, Walker never made any showing that the receipts issued by the particular fast-food restaurant to which Walker claims he went indicate anything about the time or order of a purchase. But, even if receipts do have such a notation, we do not think that the discarded hamburger wrappers, bags and other pieces of paper from the restaurant would possess an exculpatory value that was apparent before they were destroyed. Further, we cannot say that the officer's destruction of what appeared to him to be trash exhibits a bad faith effort on his part to deny Walker access to potentially useful evidence.

Second, Walker maintains that by releasing the car the state denied the jury a chance to see that there were not, in fact, any blood stains anywhere in or on the car, and prevented him from possibly showing that the treads of the tires on the car did not match the tracks left in Cooper's yard. As to the blood stains, the state admitted at trial that it had been unable to find any evidence of blood either in or on the car; thus, even though the jury cannot see the car itself, the evidence lacks materiality since the state's own admission constitutes comparable, exculpatory evidence.

The case is otherwise with the tires. We think it should have been readily apparent to an investigating officer that impressions or photographs should have been made during the processing of the car, especially in light of the facts that photographs had been carefully

made at the scene of the crime and the car was to be released. Indeed, this was standard procedure. But, while the tires do seem to constitute material evidence, we are unable to say that their release, along with the car, is evidence of bad faith on the part of the state. As the trial court noted, the handling of the automobile may indicate careless, shoddy and unprofessional investigatory procedures, but it does not indicate that the police in bad faith attempted to deny Walker access to evidence that they knew would be exculpatory. And, as to the state's delay in notifying Walker of the release of the car, we see no reason why Walker himself could not have learned of that release by making appropriate inquiries. Accordingly, we do not find that Walker was denied due process of law.

4. In December 1992, the trial court issued an order prohibiting the district attorney's office and the sheriff's department from conducting further interviews with any of Walker's cellmates without providing proper notice to Walker's counsel. In late February or early March, an attorney for Robert Gordon, who was Walker's cellmate for six months, contacted the district attorney and told him that his client had information about Cooper's murder; the attorney also requested that the district attorney interview his client without Walker's knowledge. Thus, in spite of the court's order, an assistant district attorney interviewed Gordon without informing Walker's counsel of the interview. When Gordon was interviewed a second time by the state, Walker's attorneys were present. At trial, the court, by way of sanction, informed the jury of the state's violation of its order but allowed Gordon to testify. Walker contends that the trial court erred in admitting testimony of his cellmate obtained in violation of its order.

Gordon testified that an angry Walker returned to their cell after seeing his lawyer and told him, "They're trying to pin all this all on me. It was Richard's fault that I shot the guy in the first place." This testimony was competent and legally admissible as evidence. Further, though the court informed the jury that it could take into consideration the state's violation of the order in weighing Gordon's credibility, the state's decision to circumvent the mandate of the court has more to do with the integrity of the district attorney's office than it does with Gordon's credibility as a witness.

Punishment of those who have acted in contempt of the court is a proper remedy in this situation as opposed to reversal of the accused's conviction. The decision of this trial court to rebuke counsel in the jury's presence for the violation of its order was not, under these circumstances, an abuse of discretion. There was no error.

5. The remaining enumerations of error dealing with evidence and police interrogation methods are without merit.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 28, 1994.

*Raymond E. George, Whelchel, Dunlap & Gignilliat, Thomas M. Cole,* for appellant.

*Lydia J. Sartain, District Attorney, Lee Darragh, Leonard C. Parks, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Michael D. Groves, Assistant Attorney General,* for appellee.